**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **MARVIN DANIEL TULLIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 5:15-cv-00162** |
| | : | |
| **CAROLYN W. COLVIN,** | : | **Social Security Appeal** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Marvin Daniel Tullis' application for benefits. 42 U.S.C. § 405(g). Because the Commissioner's decision is not supported by substantial evidence, it is **RECOMMENDED** that the Court **REMAND** this case pursuant to sentence four of 42 U.S.C. § 405(g).

## BACKGROUND

### A. Procedural Background

Plaintiff filed an application for a period of disability and disability insurance benefits on July 20, 2012.[1] Tr. 21, 175. The Commissioner denied Plaintiff's claims both initially and upon reconsideration. Tr. 39. Plaintiff then requested an administrative hearing. Tr. 98. Upon Plaintiff's request, the ALJ held a hearing at which Plaintiff appeared and testified. Tr. 103. Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits. Tr. 21-34. Subsequently, Plaintiff requested review from the Appeals Council and submitted additional evidence, which the Appeals Council

---

[1] Plaintiff's application has not been included in the transcript before the Court.

denied. Tr. 1-3; 7, 276-77. Plaintiff filed a timely complaint with this Court. Doc. 1. The case is now ripe for review under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

### B. Factual Background and the ALJ's Decision

Plaintiff, who was born in 1965, claimed disability beginning on August 6, 2010. Plaintiff has a high school education, as well as additional vocational training in the area of military law enforcement. Tr. 180. Plaintiff's prior work experiences range from a Boatswain's Mate First Class with the United States Navy, to a customer service representative, dispatcher, sales clerk, and security officer. Tr. 64-65, 180; 20 C.F.R. § 404.1560(b)(1). Plaintiff alleged disability due to a brain injury, stroke, multiple back injuries, joint disease, migraines, degenerative disc disease, anxiety, and post-traumatic stress disorder ("PTSD"). Tr. 179.

In rendering the decision, the ALJ concluded that Plaintiff had not performed substantial gainful activity since August 6, 2010, the alleged onset date. Tr. 23. After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine and cervical spine, degenerative arthritis of the left ankle and bilateral knees, paralysis of the sciatic and ulnar nerves, migraine headaches, and hypertension. Tr. 23. Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 25. The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform light work, with the following exceptions and limitations: "[t]he claimant is limited to occasionally climbing ramps or stairs. He can occasionally balancing, stooping, kneeling, crouching or crawling, but never climb ladders, ropes or scaffolds. He must avoid concentrated exposure to hazards such as unprotected heights." Tr. 25.

In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were not fully credible. Tr. 33. The ALJ further found that Plaintiff was capable of performing past relevant work as a sales clerk, security officer, dispatcher, and customer service clerk. Tr. 33. Accordingly, the ALJ found Plaintiff not disabled. Tr. 34.

### C. Medical Record

As a veteran of the United States Navy, Plaintiff's medical record consists of a "mountain"[2] of medical records from the Department of Veterans Affairs (VA). Plaintiff also received treatment from Phoebe Putney Memorial Hospital, Dillard Chiropractic, and Houston Healthcare.

Plaintiff testified that a majority of his injuries arise from a motor vehicle accident in 2002. Tr. 43. Prior to disability, Plaintiff had one surgery on his left knee, treatment for an umbilical hernia, and two ligament reconstructions of the left ankle in 1999. See Tr. 531-32 (full surgical descriptions and history). Plaintiff's treatment records from the VA also show that Plaintiff was seen on March 10, 2006 for non-allopathic lesions of the cervical region. Tr. 528.[3]

Both parties indicate that Plaintiff's first complaint of increased headache pain occurred on November 9, 2010, when Plaintiff presented to the Mission Valley San Diego Veterans Affairs Clinic for a compensation and pension determination—specifically to increase the

---

[2] See Tr. 74.
[3] Both the Social Security Transcript and the ALJ indicate that Plaintiff's treatment started with the VA in April 2010, yet the only event to occur during that time is an insurance effective date notice. Tr. 374.

disability rating associated with his headaches. Tr. 529. At that time the examining physician, Khanh T. Vu, M.D., recorded Plaintiff's description of his headaches as:

> unilateral, right side occurring more often than the left, and affecting the eyes and the temporal area. He admits to photosensitivity, right eye worse than the left, and he has phonosensitivity after a headache starts. He states that he does feel an aura in the right temple prior to the onset of the headache. He recently saw neurology in January due to worsening symptoms. He states that when his neck spasms worsen or if he has sinus congestion, tension, or dehydration, or he is exposed to bright lights, all of these aggravate and precipitate his migraine headache. The headache is slow onset and it gradually increases, and he can effectively control it if he takes Zomig at the onset of the headache. He denies side effects from the Zomig. He also gets chiropractic treatment 3-4 times a week and is also receiving radiofrequency treatment every 3 months and steroid injections to his neck every 3-6 months.
>
> He has gotten 4-5 flare-ups of the migraines since August 6, 2010. He states the average intensity of the headache is 8-9 out of 10, and he typically gets migraine attacks about 1-2 times a week at a low level and low intensity. The duration of the migraines lasts 4-5 hours if he treats it early with Zomig, or it could last 3-4 days if he treats his migraine late.
>
> He also has associated nausea and vomiting with his migraines. When asked how the migraines limit his activities of daily living, he states that when he has a bad flare-up, he has nausea and vomiting and therefore, he cannot function, and he needs to be in a dark room. He cannot drive during a full migraine attack. Ordinarily, he is able to walk his dog when the migraines are at low intensity.

Tr. 530. Plaintiff also reported left upper extremity numbness and tingling, which he attributed to his neck pain—not his headaches. *Id.* Plaintiff's spine and joints were examined as well. Tr. 531.

Physical examination of his left ankle revealed surgical scars, which were slightly tender, and attempts at repetitive movement of the ankle were slightly painful, without demonstrating additional functional impairment. Tr. 532. X-rays of Plaintiff's left ankle made at the time of the examination revealed the presence of two bone screws inserted through the medial malleolus[4] and one screw transversely proximal to the ankle joint. Tr. 532. Additionally, there were two

---

[4] The medial malleolus is the prominence on the inner side of the ankle, formed by the lower end of the tibia.

suture anchors in the anterior aspect of the lateral malleolus and minimal degenerative arthritic changes were noted in the ankle. Tr. 532. In particular, the referred physician, Dr. Martin L. Morris, M.D., noted degenerative changes medially at the articulation between the medial malleolus and the medial border of the talus, with an appearance of irregularity in the medial aspect of the weight bearing articular portion of the dome of the talus. Tr. 532. Upon review of the physical examination and x-rays, Dr. Morris diagnosed Plaintiff's with:

> Degenerative arthritis of the left ankle with irregular articular changes involving the medial aspect of the dome of the talus; status post arthrotomy and bone/cartilage graft to talus and status post Bostrom lateral ligament reinforcement. The veteran has a definite disability related to the condition of the left ankle. There is functional impairment in association with activities involving simply standing and walking with inability to be doing any running, jumping, etc. His impairment is on the basis of pain with the various structural changes related to the surgical procedures performed on the ankle as well as the presence of degenerative arthritic changes including the grafted area of the weight bearing surface of the dome of the talus. There is no indication of instability or incoordination. Weakness, fatigability, and lack of endurance are all contributing factors of the veteran's limitations.

Tr. 532-533.

Dr. Morris' examination of Plaintiff right ankle found no indications of hypermobility or instability, and noted that repetitive movements in the ankle were well tolerated without indication of increased symptomatology or additional impairment. Tr. 533. X-rays of Plaintiff's right ankle made at the time of the examination suggested very mild degenerative arthritic changes. Tr. 533. Dr. Morris diagnosed Plaintiff with mild degenerative arthritis of the right ankle with chronic Achilles tendinitis. Tr. 533.

Upon physical examination of Plaintiff's lumbar spine, Dr. Morris found that Plaintiff was unable to stand completely erect and stood with approximately ten (10) degrees of forward flexion. Tr. 534. Attempts at repetitive movement were not tolerated in association with the severity of his pain. Tr. 534. In the sitting position, a straight leg raise at 40 degrees on the right

and 60 degrees on the left were associated with low back pain. Tr. 534. X- rays of Plaintiff's lumbar spine made at the time of this examination demonstrated a narrowing at the L3-L4 level consistent with discogenic changes. Tr. 534. There were also posterior facet osteoarthritic changes at the LS-S1 level. Tr. 534. Dr. Morris diagnosed Plaintiff with:

> Severe musculoligamentous strain of the lumbar spine in association with discogenic changes at the L3-L4  level and posterior facet arthropathy at the LS-S1 level with evidence of bilateral lumbar radiculopathy. There appears to be a rather significant disability with functional impairment in association with any activities involving simply standing as well as bending, lifting, twisting types of activities, etc. His impairment would be on the basis of pain in association with the degenerative discogenic/arthritic changes as noted. There is no indication of instability or incoordination. Weakness, fatigability, and lack of endurance are all considered to be contributing factors of his impairment.

Tr. 534.

Finally, Dr. Morris examined Plaintiff's cervical spine, which revealed painful limitation of all movements observed by "facial grimacing and oral grunting." Tr. 535. Dr. Morris noted that Plaintiff's muscle strength in his upper extremities was normal, but that attempts at repetitive movement were not at all tolerated and not associated with additional impairment. Tr. 535. X-rays of the Plaintiff's cervical spine made at the time of the examination demonstrated flattening and loss of the normal cervical lordotic curve with definite degenerative discogenic disease involving the C4-5 and C5-6 levels. Accordingly, Dr. Morris diagnosed Plaintiff with "chronic musculoligamentous strain of the cervical spine in association with degenerative discogenic/arthritic changes at C4-5 and CS-6 levels in association with bilateral cervical radiculopathy." Tr. 535. Dr. Morris found "evidence of disability" associated with this problem, as well as functional impairment related to any activities involving movement of the cervical spine. Tr. 535.

VA treatment records note that in June 2011, the Plaintiff "ambulated independently" into the office of Karen J. Penny, RKT, for an evaluation for a TENS Unit, as he had lost his previously issued unit in the recent move from California to Georgia. Tr. 604. Also in June 2011, a CT study showed the Plaintiff had mild degenerative disc disease, most prominent at L3-4 with minimal anterior osteophytosis. Tr. 699; 1016. There was also a mild disc bulge at L4-5; however, the study indicated there was no central canal stenosis or neural foraminal narrowing. Tr. 699; 1016. Moreover, there was no definite fracture or listhesis. *Id.* Plaintiff was prescribed a back brace, and instructed to wear the brace for twenty-four (24) hours at a time. Tr. 571.

On July 7, 2011, Plaintiff was evaluated for ankle braces and shoe gear at a podiatry consult with William Jones. Tr. 583. Plaintiff stated that previous treatments in California had included "injection therapy, pain medications, TENS unit, yoga, Tai Chi, and hydrotherapy," which "benefit[ed] him greatly." Tr. 584. The physical examination revealed some limited inversion of the left ankle with more inversion noted on the right ankle with pain on palpitation about the right medial ankle and the entire left ankle. Tr. 584. Plaintiff's range of motion examination elicited pain in both ankles. Tr. 584. A physical therapy consult was ordered for Plaintiff's ankles, and Plaintiff's shoes and braces were also ordered. Tr. 584.

During October 2011, Plaintiff completed a CT scan of his head due to his complaints of headaches and memory difficulties. Tr. 641. The scan revealed "[p]ossible, somewhat fatty parotid glands of uncertain nature and significance." Tr. 1014.  The reviewing radiologist also noted a "lacunar infarct in the left external capsule and the basal ganglion area," which could be followed up by MRI and MRA studies as clinically indicated. Tr. 1014.

In November 2011, a complete CT study of the spine was conducted in response to Plaintiff's complaints of chronic back pain. Tr. 576; 587; 711; 1008-09.[5] The CT study of the cervical spine showed no definite fracture or subluxation multilevel minimal to mild disc space narrowing, and mild multilevel hypertrophic osteophytic vertebral body endplate spurring. Tr. 576; 587; 1008-09. The CT scan also showed the cervical spine appeared somewhat straightened with almost complete loss of normal lordotic curvature and suspected slight dextroscoliotic curvature. Tr. 576, 587; 1008-09. Further imaging of the thoracic spine revealed only a mild scoliotic curvature. Tr. 1011. In addition, x-rays of both knees showed questionable early arthritic changes and faint small soft tissue calcification near the distal medial left femur that could have been related to an old trauma. Tr. 1012. Dr. Silverman suggested a follow-up MRI following the results of Plaintiff cervical spine CT scan. Tr. 576, 587; 1008-09.

In December 2011,[6] treatment records noted the Plaintiff complained of bilateral knee pain that at times was associated with swelling and a very brief sensation of knee catching. Tr. 553; 812.While the ALJ noted that "the Plaintiff reported the pain was aggravated by running" (Tr. 26), the physician[7] actually noted that Plaintiff found the swelling occurred "usually when he is walking and he manages by stopping and bending the knee" (Tr. 555-56; 812-813). The ALJ recognized that this report of running was "well after" the alleged onset date of disability. Tr. 26. Plaintiff's knee pain was treated "extensively" with interventions including "physical therapy, chronic pain program, aquatic rehabilitation, CSI bilateral, acupuncture, and TENS." Tr. 556; 812. The treatment notes indicated the Plaintiff was overweight/mildly obese at this

---

[5] The results of this CT scan are scattered across the VA consult request records, with pages out of order and inserted and random intervals. However a complete collection of all radiology reports from the VA are available at Tr. 995-1013.
[6] The record reflects that Plaintiff also complained of bilateral TMJ pain during this time. The radiology results from that complaint revealed unremarkable, normal findings. Tr. 431.
[7] Dr. Vineeta Singh, M.D.

time. Tr. 556; 812. On examination, he did not have much swelling in the bilateral knees and only minimal crepitation, and no patellar asymmetry. Tr. 556; 812. He had new patella hypermobility and full extension bilaterally to 115 degrees. Tr. 556; 812. He exhibited patellar tendon tenderness to palpation bilaterally and patellar grind, bilaterally; however, he was negative for McMurray and Drawer tests, bilaterally. Tr. 556; 812. His strength was intact for his bilateral lower extremities. Tr. 553-54. The record reflects that Dr. Singh made some findings based on Plaintiff's November 2011 x-rays discussed above. See Tr. 556; 812; 1012.

Due to complaints regarding his memory, Plaintiff also underwent a neurology consultation in December 2011, with Dr. Jeffrey P. Glass, M.D. Tr. 672-675; 977-79. At the consult, Dr. Glass described the Plaintiff as non-diabetic, but probably hypertensive with migraine headaches without aura. Tr. 672-675; 977-79. He also had sleep apnea that was diagnosed in November 2011, and was being fitted with a CPAP machine. Tr. 672-675; 977-79. The treatment records also recognized that the Plaintiff supposedly had bilateral ulnar neuropathies. Tr. 672-675; 977-79. As for his chief complaint, Plaintiff stated that he had memory loss over the last five years, which had been progressive. Tr. 672-675; 977-79. He admitted to misplacing objects at home, getting lost while driving, and forgetting to record debit card transactions, yet the Plaintiff also reported that he maintained his personal hygiene and was not incontinent. Tr. 672-675; 977-79. The Plaintiff reported he had a short temper as well. Tr. 672-675; 977-79. In sum, Dr. Glass found that Plaintiff had "no overt evidence of cognitive dysfunction." Tr. 979. Furthermore, he had no clinical evidence of ulnar neuropathy on either side, and his migraine headaches were post-traumatic. Tr. 979. After reviewing the October 2011 CT scan mentioned above, Dr. Glass determined that aspirin should be prescribed to prevent a possible stroke, and that formal neuropsychological testing should be completed. Tr. 979.

In January of 2012, an MRI[8] of Plaintiff's brain revealed "a small and somewhat oval shaped focus following CSF in signal characteristics in left periinsular region, likely representing a prominent perivascular space rather than lacunar infarction." Tr. 428-429. The examining radiologist further found that "punctate foci in the periventricular white matter and centrum semiovale, greater on the left are somewhat nonspecific, could relate to early microvascular changes or demyelination." Tr. 429. No acute intracranial abnormalities were indicated, but the examining radiologist did note a left axillary antrum mucous retention cyst. Tr. 550-52. Progress notes from the transcript reveal that on January 24, 2012, Plaintiff stopped by Veteran's Affairs to receive assistance with some paperwork for school. Tr. 668. Plaintiff later realized that he forgot the paperwork, and had since dropped out of school because he was unable to remember tasks and complete assignments. Tr. 668. Plaintiff requested a referral for a neurophych evaluation. Tr. 668.

By February 2012, VA medical records indicated the Plaintiff had "a history of migraine headaches;" however, his medication, imitrex, was noted as effective. Tr. 664-667. Furthermore, the Plaintiff was assessed with post-traumatic stress disorder, and advised to continue with his medications. Tr. 664. The Plaintiff's insomnia was noted as stable; and he was told to continue his medication. *Id.* As for his neck pain and lumbar spondylosis, Plaintiff was advised to continue his medication regimen. Tr. 666-667. Additionally, the Plaintiff had an elevated blood pressure without a diagnosis of hypertension and amlodipine was initiated with instructions to hold the medication if his blood pressure was less than 110/60. Tr. 666-667. Plaintiff was assessed with a history of mild renal insufficiency, as well as an adjustment disorder. *Id.* As for his obstructive sleep apnea, treatment notes indicated the Plaintiff was using

---

[8] Plaintiff also underwent an MRA the same day, which found "no focal stenosis or aneurysmal dilation of the anterior and posterior cerebral circulation." Tr. 430.

a CPAP at home. *Id.* Finally, the Plaintiff was assessed with hyperlipidemia and Pravastatin was initiated. *Id.* The Plaintiff was also encouraged to eat a low fat and low cholesterol diet. Tr. 667.

While visiting his primary care physician on June 27, 2012, Plaintiff presented for re-evaluation and treatment of chronic problems and evaluation of his current medication. Tr. 614-17. Assessment records indicate that Plaintiff continued to manage his headache pain with imitrex. Tr. 617. The Plaintiff was again assessed with post-traumatic stress disorder, and advised to continue with his medications. *Id.* The Plaintiff's insomnia was noted as stable; he was told to continue his medication. *Id.* As for his neck pain and lumbar spondylosis, Plaintiff was advised to continue his medication regimen, and that a CT study was pending. Plaintiff had an elevated blood pressure[9] without a diagnosis of hypertension and amlodipine was encouraged as tolerated, as was a low sodium diet. *Id.* As for his obstructive sleep apnea, treatment notes indicated the Plaintiff was successfully using a CPAP at home. *Id.* Finally, the Plaintiff was assessed with hyperlipidemia and Plaintiff's prescription for Pravastatin was noted. *Id.* VA treatment records from June 20, 2012, also indicate that Plaintiff complained of bilateral knee pain, but left without being seen. Tr. 624.

On July 30, 2012, Plaintiff called VA to ask a few questions, and reported that his headaches were under control. Tr. 606.

X-rays of Plaintiff's lower extremities from August 2012,[10] showed no acute fracture or dislocation in the knee joints and only mild degenerative joint disease. Tr. 548. The x-rays did show an oval shaped calcific/ossific focus along the left medial femoral condyle that could reflect prior medial collateral liganlent injury; however, there were no significant findings

---

[9] Plaintiff's blood pressure was noted to be 134/94. Tr. 623.
[10] Later VA records disclose that while the x-ray study was done on June 27, 2012, the results were not reported until August 9, 2012. Tr. 548.

regarding the Plaintiff's knees. Tr. 548. The ALJ noted that there was no surgery recommended for the Plaintiff's knees, but there is no indication in the record that he was advised to "continue to receive conservative treatment" as the ALJ states. See Tr. 548.

Plaintiff was evaluated by a neurologist on September 19, 2012. Tr. 491. Plaintiff complained of consistent headaches with daily pain, and stated that he took "about five tablets of imitrex" a week. The neurologist, Dr. Reddy, advised Plaintiff about additional medication options which Plaintiff expressed disinterest in, and was also advised about relaxation therapy. Tr. 492. Dr. Reddy discussed Plaintiff's MRI results and instructed him to return to the clinic in four months. Tr. 492.

A recommendation from Dr. Ronald Casalino, chiropractor, penned in November 2012, noted that he had been treating Plaintiff since March of 2012, and that Plaintiff's condition had continued to worsen during that time. Dr. Casalino noted that Plaintiff' was "experiencing a lot of muscle spasms along his back" as well as "tingling in his hands and feet more frequently." Tr. 338. Dr. Casalino made similar findings in April of 2013. Tr. 341.

Plaintiff was seen in outpatient physical therapy beginning on November 29, 2012, for ten visits related to his back pain; however, he missed four of those visits.[11] Tr. 288-327. As for treatment of his back pain, the treatment notes from physical therapy indicate that Plaintiff complained of dull aching to sharp pain over his lumbar spine and paraspinal muscles at his first appointment. Tr. 326. The Plaintiff also complained of bilateral knee, ankle and neck pain and stated that "all of right and the left 2 most lateral toes [were] numb." Tr. 326. Notably, the Plaintiff reported that his pain increased with "community distance walking, household chores,

---

[11] On December 6, 2012, Plaintiff cancelled for "work related" reasons. Tr. 317. On December 28, 2012; January 3, 2013; and January 4, 2013; Plaintiff also cancelled his appointments, and no additional comments were entered. Tr. 295-96; 316.

driving, and [going] up and down steps." Tr. 326. His treatment consisted of a home exercise

program, as well as land/pool therapy consisting of instruction in lumbar and lower extremity

range of motion and land based lumbar stabilization/strengthening exercises. Tr. 287.

> At the conclusion of Plaintiff's physical therapy sessions, the therapist noted that

> patient has minimal difficulty on supine to sit, sit to and from stand, in and out of
> bed and car and up and down stairs. Patient has difficulty with staying supine
> more than 3-5 minutes due to increasing back pain.  Patient has had good
> experience with water therapy and has reached maximum rehab potential.
> Patient's pain still persist at a range of 8-6 on pain scale. Patient was given
> information with Wellness program that he can join.

Tr. 287. Plaintiff complained of "some problems with his memory" at one of his

appointments in January of 2013. Tr. 289.

In February 2013, Plaintiff underwent a spinal MRI. As noted by Dr. Singh, the MRI of

cervical spine showed a straightening of the physiologic lordosis. Tr. 400. There was "slight

disc space narrowing with somewhat hypointense." *Id.* The T2 signal was present from C3-C4

through the C6-C7 level and mild marginal spurring was noted. *Id.* At C4-C5, there was very

mild disc osteophyte seen. *Id.* A slight asymmetric hypertrophy of uncinate joints, greater on

the right, resulted in borderline to mild right foraminal stenosis. *Id.* Additionally, at C5-C6,

eccentric disc osteophyte, left paracentral and foraminal was compressing the anterior thecal sac

with mild left foraminal stenosis. *Id.* There was a slight flattening of the anterior aspect of spinal

cord noted. *Id.* The AP diameter of the spinal canal was 1.1 cm, which Dr. Singh found to be

within the normal range. *Id.* Finally, at the C6-C7, mild disc osteophyte complex was

compressing the anterior thecal sac. *Id.* The AP diameter was 0.9 cm and indicated borderline to

mild central spinal stenosis. *Id.* The ALJ concluded that "the [Plaintiff] had no findings of

significant spinal stenosis and no recommendation any surgical intervention where the cervical

spine was concerned." Tr. 28. Plaintiff was assessed with chronic neck pain with myofascial

component and mild degenerative disc disease. *Id.* The Plaintiff was offered trigger point injections like those he had received in the past. He was also given topical Lidocaine ointment 5%. *Id.*

In February 2013, the Plaintiff was seen by Dr. B. Brett Law with a complaint of worsening pain in his right hand over the past month. The Plaintiff was referred to an orthopedic specialist. Tr. 364. Blood pressure was noted to be 120/70. Tr. 364. In July 2013, the Plaintiff presented for a follow-up with Dr. Law regarding his migraine headaches, hypertension, hyperlipidemia and cervical and lumbar degenerative disc disease. Tr. 1144. The Plaintiff reported that he had an upcoming epidural for his degenerative disc disease by pain management. Tr. 1144. As for his headaches, the Plaintiff reported he had not been getting benefit from the sumatriptan for his migraines, but reported no change in his headaches or visual changes. Tr. 1144. In July 2013 Dr. Law, noted the Plaintiff's blood pressure was 134/79, which was identified as "adequate." Tr. 1144-45. The Plaintiff was assessed with migraine, unspecified, without mention of intractable migraine, and cervical degenerative disk disease. He was started on rizatriptan for migraine treatment. Tr. 1145.

On March 15, 2013, Plaintiff was sent for an evaluation regarding possible carpal tunnel syndrome. Tr. 343. Plaintiff stated he was having difficulty "eating, picking up things, and holding silverware or other items. He is unable to make a fist, and he states he drops things all the time." Tr. 343. Casalino also evaluated Plaintiff's MRI and electrodiagnostic, which revealed "bilateral carpal tunnel syndrome." Tr. 342; 343.

On April 1, 2013, Plaintiff was re-referred to Dr. Singh for neck pain and bilateral hand paresthesias. Tr. 399. In reviewing his medical history, Plaintiff stated he had five to six months of pain relief from a cervical nerve block that was done in 2010. *Id.* Furthermore, the Plaintiff

reported that he was on gabapentin, but felt it was too sedating and so he discontinued the medication on his own. *Id.* As for other medications, it was unclear if the Plaintiff was still using Desipramine (anti-depressant), as it had not been refilled since February. *Id.* The Plaintiff was using Etodolac, Flexeril and topical Salicylate, which he indicated did help with the pain. *Id*.

On physical examination, the Plaintiff had mild cervical range of motion restriction. Tr. 399. A Spurling test was equivocal for upper extremity ulnar dyesthesias, as also reproduced on palpation of right upper trapezius trigger point. Tr. 399. There was tenderness to palpation of the lower cervical spine. Tr. 400. The Plaintiff had negative Tinel's tests of the bilateral wrists, but the bilateral ulnar groove was tender to palpation and palpation on right was associated with radial wrist pain. Tr. 400. Notably, there was no intrinsic atrophy and only slight right grip weakness. *Id*. Treatment notes indicated that a 2008 nerve conduction study was negative for carpal tunnel syndrome, ulnar neuropathy, and cervical radiculopathy. *Id.*

X-rays of the lumbar spine done in April 2013 revealed mild degenerative changes with slight narrowing of LS-S1 disc space and small anterolateral osteophytes. Tr. 370. Furthermore, two views[12] of the right ankle showed mild degenerative changes; however, there was no definite acute fracture noted. X-rays also showed a plantar calcaneal and questionable soft tissue prominence over the lateral malleolus; however, it was noted that this might be normal for the Plaintiff or might represent some soft tissue trauma. Tr. 371-72.

Also on April 1, 2013, VA treatment notes indicated the Plaintiff "ambulated independently into [the] office" for an evaluation for an uplift device. Tr. 401. An additional assessment was completed and Plaintiff was issued an uplift device, as well as other items

---

[12] The ALJ incorrectly stated three views were taken. Tr. 371.

to assist with daily activities such as toilet safety frame, reacher, long shoe horn, long handled sponge, and a sock aide. Tr. 401. A prosthetic request was also initiated. *Id.*

On April 30, 2013, Plaintiff was seen by Dr. Law and was assessed with a Urinary Tract Infection. Tr. 362. Plaintiff's blood pressure was 122/72, but the medication list shows Plaintiff was prescribed amlodipine once a day. Tr. 362.

Furthermore, Plaintiff complained of increased memory loss and confusion; however, a CT study of the head done in November 2013 showed no acute intracranial process or evidence of acute fracture. Tr. 405. There were some vague small amounts of subcortical and periventricular chronic white matter microvascular ischemic changes. *Id.* Additionally, there was a stable somewhat ovoid 6 x 4 mm hypodensity in the left peri-insular region consistent with suspected perivascular space that was unchanged. *Id.* Finally, there was a small polyp again identified in the superior left maxillary sinus. *Id.* Overall, there were no significant changes from previous CT study done in October 2011 and the MRI study done in January 2012, respectively. Tr. 405.

As of August 2013, Plaintiff was seen by pain management specialist Dr. Lamar Moree at the request of the VA clinic. Tr. 1127. He was seen specifically for a cervical epidural steroid injection. He complained of neck and upper back pain that radiated into both arms. The Plaintiff reported that he experienced lower back pain. The purpose of his visit was his neck and upper back pain, which he stated was increased with "physical activity, cold weather, cloudy weather, and with bright lights." Tr. 1127.

On physical examination, there was moderate tenderness on palpation of the posterior cervical spine. Tr. 1128. There was muscle spasm noted in the trapezius muscle as well as decreased passive range of motion of the cervical spine; however, the upper extremities were

neurovascularly intact. Furthermore, the lumbar spine was slightly tender to palpation. Straight leg raise testing was negative bilaterally to an angle of 60 degrees in the lower extremities. His deep tendon reflexes were 2+ and physiologic bilaterally in the lower extremities. Overall, Dr. Moree determined Plaintiff was a good candidate for cervical epidural steroid injection therapy to diminish his symptoms. Tr. 1128.

On November 1, 2013, Plaintiff was seen by Dr. Lamar Moree for an evaluation for pain management. Tr. 1123. Plaintiff's complained of ongoing upper back and neck pain. *Id.* He also complained of ongoing low back pain that radiated into both legs. *Id.* He stated that he continued to have mid back pain as well. *Id.* Plaintiff found that the pain increased with twisting, turning, bending, walking and standing for prolonged periods of time, and rated his pain at a nine on a pain scale of one to ten. *Id.* On physical examination, Dr. Moree found moderate tenderness to palpation at the base of the cervical spine. *Id.* There was a mild muscle spasm noted about the trapezius musculature and a decreased range of motion on flexion and extension of the cervical spine. *Id.* Bilateral hand grip strength was normal and the cranial nerves II through XII appeared to be grossly intact. *Id.* There was moderate tenderness to palpation of the lumbosacral spine, and a negative straight leg raise test bilaterally in the lower extremities at a 60 degree angle. *Id.* Deep tendon reflexes were 2+ bilaterally in the lower extremities at the level of the knees and ankles. *Id.*

Dr. Moree's impressions found: (1) low back pain secondary to degenerative disc disease of the lumbosacral spine with disc bulging at the level of L3-L4; (2) upper back and neck pain secondary to degenerative disc disease of the cervical spine; (3) Migraine syndrome by history; (4) a previous cerebrovascular accident; (5) previous history of traumatic brain injury; (6) PTSD; (7) osteoarthritis; and (8) fibromyalgia. Tr. 1123. Dr. Moree prescribed an injection of 60

milligrams (mg) of Toradol intramuscularly, that was administered in the office that day, and decided to perform a lumbar epidural steroid injection at the level of LS-SI under fluoroscopy as well. *Id.*

At a follow-up visit with Dr. Moree a week later, Plaintiff presented with continued complaints of ongoing upper back and neck pain. Tr. 1121; 1168. He also complained of "chronic, stabbing, throbbing" low back pain that radiated into both legs. Tr. 1121; 1168. On physical examination, there was moderate tenderness to palpation at the base of the cervical spine. There was mild muscle spasm noted about the trapezius musculature and decreased range of motion on flexion and extension of the cervical spine; however, bilateral hand grip strengths were normal. Tr. 1121; 1168. Additionally, there was moderate tenderness to palpation of the lumbosacral spine. There was also a negative straight leg raise test bilaterally in the lower extremities at a 60 degree angle. Moreover, his deep tendon reflexes were 2+ bilaterally in the lower extremities at the level of the knees and ankles. Tr. 1121; 1168. Plaintiff was given a prescription for Lodine, and was told to return to the office in a month. Tr. 1121; 1168.

In April 2014, the Plaintiff presented to Dr. Moree's office continuing to complain of low back pain. Tr. 1163. He described the pain as a "shooting, stabbing, throbbing, aching sensation that radiate[d] into his buttocks and into his thighs." Tr. 1163. On physical examination, there was moderate tenderness to palpation of the lumbosacral spine, as well as moderate tenderness to palpation to the sciatic notches; however, there was a negative straight leg raise test bilaterally in the lower extremities at a 60 degree angle. Tr. 1163. The Plaintiff was prescribed Ultram and given a one month follow-up. Tr. 1163.

In January 2014, the Plaintiff was seen as a new patient for a neurological consultation with Dr. Marla Black-Morgan. Tr. 1113-16. During his visit, the Plaintiff stated he was sent for

evaluation of memory loss, headaches and confusion. Tr. 1113. Plaintiff reported other issues, as well, including "recent weight changes, fatigue, difficulty sleeping, headaches, dizziness, tingling and pain in his hands and feet, memory loss, […] sensitivity to light, blurred vision, loss of hearing, trouble with balance, nausea, color changing in his hands and feet with swelling, anxiety, depression, heartburn, morning stiffness, occasional muscle weakness, sexual difficulties, and back pain." Tr. 1114. Dr. Black-Morgan noted that the Plaintiff continued to play and listen to music on his mp3 player and wore shades throughout the interview and examination. Tr. 1114.

On physical examination, the Plaintiff appeared in no acute distress. Tr. 1114. A musculoskeletal exam revealed there was no edema, while his vascular exam revealed normal carotid pulses—his blood pressure was 132/95. Tr. 1114 As for his mental status, the Plaintiff was awake and alert and was able to follow commands, but he had some difficulty providing some specific details of his medical history. Tr. 1114. His motor strength testing revealed "4+/5 throughout with give-way weakness and normal tone." Tr. 1114. Dr. Black-Morgan noted this was a patient who had a history of headaches that might be post-traumatic in nature and with some migraine features. She observed that Plaintiff had some cognitive impairment primarily in the form of confusion with some memory loss, but that it appeared to be more related to processing of information. Tr. 1115. Dr. Black-Morgan also noted Plaintiff's carpal tunnel syndrome diagnoses. For treatment, Plaintiff was given medications for his migraines, and she recommended a referral to the NeuroRestorative Program in Augusta. Tr. 1116.

In June 2014, Plaintiff presented in the Emergency Room with complaints of back pain and blood in his urine. Tr. 1031-33. No other pain was noted. Tr. 1034. Treatment

records indicated the Plaintiff's symptoms were consistent with a urinary tract infection. Tr. 1038. Treatment records noted Plaintiff had a normal gait and motor examination, no tenderness in his back, and normal range of motion. Tr. 1035. Plaintiff's extremities were also found to be normal. Tr. 1035. He was discharged and told to take his home medications as advised.

In June and August 2014, treatment records from Pavilion Family Medicine reveal the Plaintiff was assessed with benign essential hypertension. Tr. 1147-49. Notably, the Plaintiff's mental status examinations during those visits were noted as normal. *Id.* The undersigned also noted the Plaintiff was diagnosed with mixed hyperlipidemia; however, Plaintiff stated that he wanted to try diet and exercise before he was started on a statin drug. Tr. 1151. As the ALJ recognized, just prior to his disability hearing the Plaintiff was well enough to consider an exercise regimen. *Id.*

## APPLICABLE STANDARDS

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that

the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel*, 631 F.3d at 1178. "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## ANALYSIS

Plaintiff does not challenge the ALJ's determinations at Step One of the evaluation process. Instead, Plaintiff argues that the Administrative Law Judge's decision did not properly evaluate and assess Plaintiff's case at Steps Two, Three and Four. Plaintiff brings the following issues on appeal:

1. Whether the ALJ properly determined Plaintiff's severe impairments.

2. Whether the ALJ properly determined his RFC.

3. Whether the ALJ gave appropriate weight to Dr. Strickland.

4. Whether the ALJ properly considered the Veterans Affairs Disability Finding

Each of Plaintiff's issues is addressed below.

**Plaintiff's Severe Impairments**

At step two, the ALJ determines a claimant's severe impairments. A severe impairment is one that significantly limits a claimant's physical or mental abilities to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1521(a), 416.920(a)(4)(ii), (c). The claimant bears the burden of proving that an impairment is a severe impairment. See *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). "A diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment of his ability to work." *Wind v. Barnhart*, 133 Fed. App'x. 684, 690 (11th Cir. 2005) (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). The relevant question is the extent to which the impairment limits the ability to work.

Here, Plaintiff argues that the ALJ's finding that his carpal tunnel syndrome ("CTS") was not severe is not supported by substantial evidence. Doc. 7, pp. 6-7. In her opinion, the ALJ noted that Plaintiff had been diagnosed with carpal tunnel syndrome in March of 2013, after he underwent a nerve conduction study in which the electrophysiological findings were indicative of carpal tunnel syndrome. Tr. 23. The ALJ further noted that despite Plaintiff's CTS, Plaintiff suffered "no muscle atrophy in the right hand and retained good grip strength." Tr. 34; Tr. 1110. The ALJ also found Plaintiff's carpel tunnel non-severe because Plaintiff had "not had any surgery for his carpal tunnel syndrome." Tr. 23-24. The ALJ determined that this impairment is "either episodic and/or controlled by medication" so that it causes "no more than a minimal limitation on the claimant's ability to perform basic work activities."  Tr. 24.The ALJ further found that Plaintiff CTS was a non-severe impairment within the meaning of the statute. Tr. 24.

The medical record supports the ALJ's finding that CTS was not a severe impairment. Plaintiff's history of CTS begins after a 2008 nerve conduction study, which found Plaintiff

negative for CTS, ulnar neuropathy, and cervical radiculopathy. Tr. 400. Five years later, Plaintiff was diagnosed with CTS in March of 2013 following a separate nerve conduction study. Tr. 342-343.  Comparing the March 15, 2013 study to an electrodiagnostic report conducted on August 29, 2013, Dr. Black- Morgan noted "interval worsening" of Plaintiff's CTS. Tr. 1130. During a consult in January of 2014, Dr. Black-Morgan again recognized Plaintiff's CTS diagnosis, but the condition was not addressed or mentioned in Plaintiff's comprehensive diagnostic or treatment plan. See Tr. 1027-1028.

In March of 2014, Plaintiff was seen for an orthopedic consult at the Eisenhower Army Medical Center by Dr. Charles Wispert, an orthopedic surgeon, where Plaintiff indicated that he "was not interested in surgery [for his CTS] at this time," and wished to treat the condition "non-operatively if possible." Tr. 1110. Plaintiff further declined a carpal tunnel injection as he had previously had a skin reaction to the steroid, but instead stated that he would like to try occupational therapy and night splints. *Id.* It was noted that Plaintiff would return to the clinic if he decided that he wanted to have surgery. *Id.* On May 28, 2013, a VA report listing Plaintiff rated disabilities did not include carpal tunnel syndrome in determining Plaintiff's disability, but listed the diagnosis only as "provisional." Tr. 377. During none of Plaintiff's medical evaluations in 2014 was Plaintiff noted to have loss of grip strength, although Dr. Thomas Jeffcoat found in July of 2013 that fingering manipulations should be considered as a limitation in Plaintiff's RFC due to his "mild CTS." Tr. 93; see *Moore v. Barnhart*, 405 F.3d 1208, 1213 n. 6 (11th Cir. 2005) ("the mere existence of these impairments does not reveal the extent to which they limit [his] ability to work or undermine the ALJ's determination in that regard.") (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)).

In sum, because the medical evidence provides substantial evidence that Plaintiff's CTS was not a severe impairment, this issue is not grounds for remand of the ALJ's decision.

### Plaintiff's RFC Determination

Plaintiff argues that the ALJ's RFC Determination is flawed because the ALJ did not incorporate Plaintiff's limitations from his: (1) ulnar nerve paralysis (Doc. 7, pp. 8-9) or (2) migraines (Doc. 7, pp. 5-6), when evaluating Plaintiff's RFC.

A Plaintiff's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The determination of the RFC is an administrative assessment based on all the evidence of how Plaintiff's impairments and related symptoms affect his ability to perform work-related activities. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The regulations state that the final responsibility for assessing a claimant's RFC rests with the ALJ, based on all the evidence in the record. See 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 404.1546(c), 416.927(e)(2), 416.945(a)(3), 416.946(c). Relevant evidence includes medical reports from treating and examining sources, medical assessments, and descriptions and observations of a claimant's limitations by the claimant, family, neighbors, friends, or other persons. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a) (3). When an ALJ articulates specific reasons for declining to give a treating physician's opinion controlling weight, and the reasons are supported by substantial evidence, there is no reversible error. *See Forrester v. Commissioner of Social Sec.*, 455 Fed. App'x. 899, 902 (11th Cir. 2012) ("We have held that an ALJ does not need to give a treating physician's opinion considerable weight if evidence of the claimant's daily activities contradicts the opinion."). Indeed, an ALJ "may reject any medical opinion, if the evidence supports a contrary finding." *Id.* at 901.

Further, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources." SSR 96–6p. The weight given to a non-examining consultant's opinion depends on "the extent to which it is supported by clinical findings and is consistent with other evidence." *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. App'x. 869, 873 (11th Cir. 2011); see also *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).

The Court must also be aware that some opinions, such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's residual functional capacity. See, e.g., 20 C.F.R. § 404.1546(c).

In formulating Plaintiff's RFC, the ALJ analyzed the record as a whole, including Plaintiff's treatment records from Veterans Affairs, consultative physician Dr. Marla Black-Morgan, consultative physician Dr. Bret Law, consultative physician Dr. Lamar Moree, the State Agency reviewers, and the testimony of Plaintiff. Tr. 25-33. The ALJ organized his opinion to address Plaintiff's physical impairments first and his mental impairments second. As stated above, the ALJ considered Plaintiff's testimony, but did not find it wholly credible. Tr. 32. The ALJ then turned to the medical record and accorded greater weight to the opinions of the state

agency reviewing physicians than the opinions of the Veterans Affairs administration or consultative physicians. Plaintiff's arguments address the ALJ's treatment of Plaintiff's consultative physicians, the VA, as well as his own testimony.

### 1. Migraines

The ALJ made several references to Plaintiff's migraines when making her RFC determination. Specifically, the ALJ noted that Plaintiff was diagnosed by Veterans Affairs with migraine headaches in November 2010, confirmed during a neurology consult in December 2011. Tr. 26, 27. By February 2012, the VA indicated that Plaintiff had "a history of migraine headaches; however, his medication, imitrex, was noted as effective." Tr. 27. When Plaintiff received disability from the VA in 2012, the ALJ listed migraine headaches as accounting for thirty percent of his service connection rated disability. Tr. 28. The ALJ considered the consultative opinion of Dr. B. Bret Law, who found that Plaintiff's more recent pain medication, sumatriptan, was not effective for his migraines, but reported "no change in his headaches or visual changes." Tr. 29. The ALJ considered the opinion of consultative examiner Dr. Moree, who assessed Plaintiff with "migraine syndrome by history," and consultative examiner Dr. Marla Black-Morgan who "noted this was a patient who had a history of headaches that might be post-traumatic in nature and with some migraine features." Tr. 31. While Dr. Moree did not prescribe any medication for Plaintiff's headaches, Dr. Marla Black-Morgan did. Tr. 31.

The record reflects that Plaintiff reported several limitations due to his headaches, including the inability to perform house or yard work, in part, due to severe migraines triggered by brightness. Tr. 200. At his hearing, he testified that he had a "constant headache;" (Tr. 57) and that while almotriptan was sometimes effective, he could not take it when he had to drive to medical appointments. Plaintiff stated:

> …and the headaches are constant; but what happens with, like, with the lights, it intensifies and gets to the level where I, I throw up, my nose bleeds. I have to be in a dark, cool place for hours at a time. And sometime, it lasts three days; sometimes, it lasts a week; and sometimes, it goes back to down to a certain level, but it never totally goes away; and then, it comes back up again….

Tr. 62. Plaintiff also testified that he was put on Family Medical Leave from his job at the Home Depot because he was missing so much time from work as a result of his migraines. Tr. 63. Plaintiff made similar complaints of pain to consultative examiner Dr. Marla Black-Morgan, when he complained of constant headaches that felt like a "ball peen hammer" to the right side of his head. Tr. 1025.

The ALJ found that Plaintiff's testimony concerning his symptoms and their limiting effects was not entirely credible. Specifically, the ALJ recognized that Plaintiff

> … engages in a wide range of daily activities that is inconsistent with someone alleging total disability. At the hearing, the claimant testified he stays at home alone while his wife works. He testified he is able to shower, do laundry, uses the electric sweeper and helps around the house. Furthermore, the claimant reports he cleans his CPAP machine, attends church, pays his bills, manages his money, goes out alone, helps open up the church, visits his mother twice a week, gets dressed and goes to his appointments at the VA Hospital (which he states is 2 hours away). At the hearing, the claimant did testify that he could walk a block, sometimes uses a rolator, and sometimes took out the trash. Additionally, the claimant's wife reports that the claimant washes, does laundry with some ironing, and does some light cleaning around the house. She also reported the claimant could drive, and shop by phone computer, or at the store. In addition, she reports that he ministers to people, and can finish tasks that he starts.

Tr. 33 (internal citations omitted). He also noted that Plaintiff's headaches were controlled with effective medication.

Additional evidence in the record supports the ALJ's finding that while Plaintiff suffers from the severe impairment of migraines, the limitations were minimal and controlled by medication. At the time of Plaintiff's initial diagnosis in 2010, Plaintiff was being seen for a migraine disability increase evaluation, complaining of a constant, mild headache. Tr. 529. Plaintiff told the physician that he was sensitive to light once the headache starts, suffered from

nausea and vomiting associated from the headache, but that he could "effectively control it if he takes Zomig at the onset of the headache." Tr. 530. The doctor further noted that "when asked how the migraines limit his activities of daily living, he stated that when he has a bad flare-up, he had nausea and vomiting and therefore, he cannot function, and he needs to be in a dark room." Tr. 530. Plaintiff further complained that while he could not drive during a full migraine attack, "[o]rdinarily, he is able to walk his dog when the migraines [were] at low intensity." *Id.* Dr. Mark T. Gabuzda advised Plaintiff not to drive across country when Plaintiff moved, due in part to his headaches. Tr. 537.

Following a VA disability evaluation in December 2011, Dr. Kathleen McGowan found that Plaintiff was "likely unemployable for physical and sedentary gainful employment." Tr. 810-811. In support of her decision, Dr. McGowan noted:

> Regarding sedentary employment, Mr. Tullis is unable to sit for greater than 20 minutes, he is unable to drive without taking a break 2  hours, has constant headaches , which are accompanied by nausea and at times vomiting, and he is unable to work on a computer for greater than 10 to 15 minutes.

Tr. 810. Plaintiff complaints of constant headache pain were a factor in her disability determination. Tr. 819-820. At that time Plaintiff stated that the headaches were improved with darkness, quiet, hydrocodone, chiropractic treatment and massage therapy. *Id.* Following an appointment in December 2011, Plaintiff was prescribed imitrex for migraine headaches by consultative neurologist, Dr. Jeffrey P. Glass. Tr. 979. Plaintiff was also prescribed aspirin to prevent the possibility of a stroke. *Id.*

In January of 2012, Plaintiff still complained of "headaches all the time/every day." Tr. 670. Specifically, he complained that "his head feels like it fills up with water and he becomes confused and forgets how to complete simple tasks." Tr. 670. By February 17, 2012, Plaintiff recognized treatment with imitrex was effective for his headache pain. Tr. 664. In March of

2012, Dr. Glass found that Plaintiff was taking "[i]mitrex for acute headaches four times during the last three months with complete relief within an hour." Tr. 647. On June 12, 2012, the agency found Plaintiff "30 percent disabled" due to his migraines. Tr. 413. The agency explained the rating as supported by "characteristic prostrating attacks occurring on an average of once a month over the last several months." Tr. 413.  By September 19, 2012, the imitrex was becoming less effective, as Plaintiff began taking five tablets a week, with a sharp throbbing pain bilaterally. Tr. 491. Yet when Dr. Adhikari Reddy offered different medications for headache pain, such as amitriptyline or divalproex, Plaintiff stated that he did not want to take other medications, and felt comfortable with imitrex. Tr. 491-492.

On May 13, 2013, Plaintiff presented to the clinic requesting a stronger medication for his headache than sumatriptan because he believed the medication to be generic, but reported no headache at the time. Tr. 387. On July 30, 2013, Dr. Law prescribed Plaintiff rizatriptan for his migraines. Tr. 1145.

On January 14, 2014, Dr. Marla Black-Morgan prescribed Plaintiff relpax for his migraines. Tr. 1027. On June 30, 2014, while visiting the Emergency Room, Plaintiff denied headache pain, but stated that he had a medical history of headaches. Tr. 1034, 1035. During an ambulance ride on August 7, 2014, Plaintiff told a nurse during that a previous MRI showed signs of a stroke, and that he had been diagnosed with a "traumatic brain injury."[13] Tr. 1153. Plaintiff was prescribed topiramate, ibuprofen, hydrocodone, and almotriptan malate for headache treatment. Tr. 1155.

---

[13] Plaintiff has regularly been prescribed medication for the prevention of a stroke, but there is no medical evidence to support Plaintiff's contention that he has had a stroke.

In light of the evidence, the ALJ did not err in failing to "encompass migraines in her hypotheticals" as the ALJ had substantial evidence for finding that Plaintiff's headache symptoms were controlled with medication. Remand on this issue is not warranted.

2. *Ulnar Paralysis*

Similarly, the ALJ made several references to Plaintiff ulnar paralysis when making her RFC determination. Specifically, the ALJ noted that Plaintiff was diagnosed by Veterans Affairs with ulnar nerve paralysis in November 2010, though the ALJ questioned the treatment records finding that Plaintiff "supposedly had bilateral ulnar neuropathies." Tr. 26, 27. Her doubt was supported by "a lack of clinical evidence of ulnar neuropathy of either side." Tr. 27. When Plaintiff received disability from the VA in 2012, the ALJ listed paralysis of each ulnar nerve as accounting for 30% and 20% of his service connection rated disability, respectively. Tr. 28. The ALJ considered a physical examination of Plaintiff conducted on April 1, 2013, which found that "spurling test was equivocal for upper extremity ulnar dyesthesias" while the "bilateral ulnar groove was tender to palpitation and palpitation on right was associated with radial wrist pain." Tr. 28; 399. The ALJ also considered treatment notes from a 2008 nerve conduction study, which indicated a negative finding for ulnar neuropathy. Tr. 28; 399.

The record reflects that Plaintiff had reported several limitations consistent with paralysis of the ulnar nerve. Specifically, Plaintiff complained of numbness, burning, loss of grip strength, difficulty holding things, dropping items, and chronic pain. As stated above, the ALJ found that Plaintiff's testimony concerning his symptoms and their limiting effects were not entirely credible and were not supported by objective medical evidence, as Plaintiff testified that he was able to engage in activities such as light cleaning, meal preparation, washing laundry, shopping

in stores or by computer, and driving, and opinion testimony found Plaintiff's complaints consistent with his cervical spine injuries.

Additional evidence in the record supports the ALJ's finding that while Plaintiff suffers from the severe impairment of ulnar paralysis, the limitations are minimal and controlled by medication. It is unclear from the record at what point Plaintiff was diagnosed with ulnar paralysis, but in November 2010, Plaintiff complained of numbness and tingling in his left upper extremity. Tr. 530. These symptoms were attributed to Plaintiff's cervical spine injuries *instead* of the ulnar nerve. Tr. 535. A neurological consultation on December 22, 2011, by Dr. Jeffrey Glass, revealed that Plaintiff had normal muscle mass, tone, and strength in all four extremities, intact sensation, and appropriate finger-to-finger-to-nose test results. Tr. 675. He also stated there was "no clinical evidence of ulnar neuropathy on either side. *Id.* In June of 2012, the VA assigned a thirty percent disability evaluation for Plaintiff's right upper extremity, and a twenty percent disability for Plaintiff's left upper extremity. Tr. 414. On February 19, 2013, Dr. Law found weakened grip strength in Plaintiff's right upper extremity, but no significant swelling or erythema. Tr. 364.  Yet just six months later, on August 5, 2013, Dr. Moree found a full range of motion in Plaintiff's upper extremities. Tr. 1062. On August 29, 2013, an electrodiagnostic report found that "the right ulnar sensory nerve showed prolonged distal peak latency and mildly slow conduction velocity." Tr. 1117. Dr. Black-Morgan found the findings indicative of "a very mild right distal ulnar sensory neuropathy." *Id.* Again, on November 7, 2013, Plaintiff's bilateral hand grip strengths were normal. Tr. 1121. The ALJ also cited a 2014 emergency room visit, which documented that Plaintiff's upper and lower extremities were normal, that his neck had full range of motion, and that his back was non-tender. Tr. 31, 1035.

Accordingly, the ALJ did not err in failing to include ulnar paralysis in her hypotheticals as the ALJ's finding that Plaintiff's limitations were controlled with medication or attributed to Plaintiff's cervical spine injuries, is supported by substantial evidence.

**Whether the ALJ properly considered the opinion of Dr. Strickland.**

In determining the availability of jobs in the national economy, the ALJ the compared the demands of Plaintiff's past work with his RFC, and requested that Robert Beadles, Ph. D., a vocational expert ("VE") testify. Tr. 33-34, 64-65, 142. Dr. Beadles testified that Plaintiff's work as a Boatswain's Mate was a heavy, skilled occupation; that Plaintiff's work as a sales clerk and security officer were light, semi-skilled occupations; and that Plaintiff's work as a dispatcher and customer service representative were sedentary, skilled occupations. Tr. 64-65.

Following Dr. Beadle's testimony, the ALJ posed four questions regarding a hypothetical individual with Plaintiff's vocational factors and RFC. Tr. 65-67. In response, the VE testified that a hypothetical individual with Plaintiff's vocational factors and RFC could perform Plaintiff's past work with the exception of Boatswain's Mate. Tr. 65. The ALJ's second question further limited the hypothetical individual to sedentary work, and the VE testified that the individual could perform Plaintiff's past sedentary work. Tr. 65. The ALJ's third and fourth questions included the additional limitations of a sit/stand option, no more than frequent handling or fingering with the upper extremities, no more than occasional overhead reaching, the use of a rollator to get to and from the work-station, and simple, routine, unskilled tasks. Tr. 65-66. In response to the third hypothetical, the VE testified that no past work was available but that the individual could perform the light jobs of greeter and automatic packer with 3,900 positions in the state of Georgia and 150,000 positions in the national economy. Tr. 67. In response to the fourth hypothetical, the VE testified that the individual could perform the sedentary jobs of

machine tender and accounting clerk with 3,600 positions in the state of Georgia and over 325,000 positions in the national economy. Tr. 66-67. Consistent with the testimony of the VE in response to the first hypothetical question, the ALJ found that Plaintiff could perform past relevant work and was not under a disability at any time prior to the date of the hearing decision. Tr. 34-35.

Plaintiff contends that the ALJ erred in the above-stated assessment, as the ALJ mischaracterized Dr. Strickland's opinion in limiting Plaintiff to light work, when Plaintiff's limitations as found by Dr. Strickland were more consistent with sedentary work. The ALJ stated: "[a]s for the opinion evidence, the undersigned affords great evidentiary weight to the State Agency Consultants. They opine the claimant is capable of light exertional residual functional capacity and has non-severe mental impairments." Tr. 33.

The record reflects that on October 20, 2012, Dr. Robert Strickland completed a preliminary RFC for the SSA. Tr. 77-79. He found the following exertional limitations for Plaintiff: (1) Occasionally lift and/or carry (including upward pulling) 10 pounds; (2) Frequently lift and/or carry (including upward pulling) less than 10 pounds; (3) Stand and/or walk (with normal breaks) for a total of 2 hours; (4) Sit (with normal breaks) for a total of about  6 hours in an 8-hour workday; (5) Push and/or pull (including operation of hand and/or foot controls) unlimited, other than shown, for lift and /or carry. Tr. 78.

Social Security Ruling 83-10 explains that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10. Sedentary jobs are defined as those jobs which require walking and standing occasionally. "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an

8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday." *Id.* After reviewing Dr. Strickland's assessment, his description of work and relevant limitations are more consistent with sedentary work than light work. However, any misinterpretation by the ALJ is harmless as the VE testified that there were also sedentary jobs available in the national economy. See *Diorio v. Heckler*, 721 F. 2d 726, 728 (11th Cir. 1983); *Howard v. Soc. Sec. Admin., Comm'r.*, 566 F. App'x 784, 787 (11th Cir. 2014) ("even if the AC improperly failed to consider some of [the plaintiff's] additional evidence, any error was harmless because we have independently reviewed all submitted evidence.").[14] Thus, substantial evidence supports the ALJ's finding that Plaintiff was not disabled.

## Disability Determination of the Veterans Administration.

Plaintiff argues that the ALJ erred by failing to give great weight to the VA's finding that Plaintiff was 100% disabled. Doc. 7 pp. 9-12. Plaintiff contends that while the ALJ was not bound by the VA's determination, the VA's determination was still entitled to great weight, and if the finding is rejected, the ALJ was required to explain the basis of the rejection. *Id.* In response, Defendant argues that the ALJ properly considered evidence from the VA and found that the VA's determination was based on different rules and not binding on the SSA. Tr. 28.

The decision of another governmental agency about whether a claimant is "disabled" is based on the rules of that agency and is not binding on the Commissioner. 20 C.F.R. § 404.1504. Nevertheless, the Eleventh Circuit has held that "'[t]he findings of disability by another agency, although not binding on the [Commissioner], are entitled to great weight.'" *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1241 (11th

---

[14] In the Eleventh Circuit, unpublished decisions are not binding, but are persuasive authority. See 11th Cir. R. 36-2.

Cir. 1983)). The Eleventh Circuit has concluded that an ALJ may make an implicit finding regarding a VA disability rating. See *Kemp v. Astrue*, 308 F. App'x 423, 426 (11th Cir. 2009).

With respect to the VA's disability rating, the ALJ stated the following in his opinion:

The undersigned notes that despite a finding of 100% disability by the Veterans Affairs Administration, Social Security was not bound by the same rules and regulations when determining disability.

R. 28. The ALJ then specifically listed the rated disabilities and the service connection as found by the VA:

paralysis of sciatic nerve (40%), paralysis of sciatic nerve (40%), degenerative arthritis of the spine (40%), migraine headaches (30%), paralysis of ulnar nerve (30%), paralysis of ulnar nerve (20%), limited flexion of knee (20%), degenerative arthritis of the spine (20%), tendon inflammation (10%), limited motion of ankle (10%), limited motion of the jaw (10%), residuals of foot injury (10%), limited flexion of knee (10%), residuals of foot injury (10%), limited motion of ankle (10%), tinnitus (10%), superficial scars (10%), scars (0%) scars (0%), stricture of the urethra (0%), and dermatophytosis (0%).

R. 28. The ALJ later revisited the VA's disability finding, but did not specifically address any factors or reasons that detracted from the determination or clarify the weight given to the determination.

20 C.F.R. §§ 404.1504 and 416.904 provide:

*A decision by any* nongovernmental agency or any *other governmental agency about whether you are disabled* or blind is based on its rules and *is not our decision about whether you are disabled* or blind. We must make a disability or blindness determination based on social security law. Therefore, *a determination made by another agency that you are disabled or blind is not binding on us.*

*Id.* (emphasis added). Thus, the regulations provide that a decision by another government agency, such as the VA, about whether a claimant is disabled is not binding on the Commissioner. *Id.* The ALJ's statements regarding the VA's disability rating decision mirror the above-quoted regulations. R. 28.

While such other governmental determinations of disability are not binding, SSR 06-3p provides:

> [W]e are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental...agencies. Therefore, evidence of a disability decision by another governmental...agency cannot be ignored and must be considered....[T]he adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases....

*Id.* (emphasis added). Thus, SSR 06-3p requires the Commissioner to evaluate decisions by other governmental agencies and provides that the ALJ should explain the consideration given to those decisions. *Id.* See *Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 775 (11th Cir. 2010) (Social Security Rulings are binding on the Commissioner) (unpublished).

In *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981), [15] the former Fifth Circuit held that while VA disability decisions are not binding on the Commissioner, they are "evidence that should be considered and [are] entitled to great weight." *Id.* Since *Rodriguez*, the Eleventh Circuit has also held that "'[t]he findings of disability by another agency, although not binding on the [Commissioner], are entitled to great weight.'" *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1241 (11th Cir. 1983)).[16] The Eleventh Circuit has stated that the weight afforded to disability ratings from the VA may be implicit in the ALJ's decision. See *Kemp v. Astrue*, 308 F. App'x 423, 426 (11th Cir. 2009) (unpublished). However, Courts within the Eleventh Circuit—including this Court—have remanded decisions where the ALJ has not specifically identified VA disability ratings themselves, specified the weight given to them, or engaged in a meaningful evaluation of them.

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[16] See also *Ostborg v. Comm'r of Soc. Sec.*, 610 F. App'x 907, 914 (11th Cir. 2015) ("A VA rating, while not binding on the SSA, is evidence that should be considered and is entitled to great weight.") (unpublished and internal quotations omitted).

See *Rodems v. Colvin*, 2014 WL 795966, at *5 (N.D. Ala. Feb. 27, 2014) (reversing, in part, because the ALJ did not state what the disability ratings were or the weight accorded to them); *Rainwater v. Colvin*, 2013 WL 4763742, at *3-4 (M.D. Ga. Sept. 4, 2013) (ALJ failed to articulate adequate reasons for discounting VA decision because the only reason given was that the decision is not binding on the Commissioner); *Salamina v. Colvin*, No. 8:12-cv-1985-T-23TGW, 2013 WL 2352204, at *3-4 (M.D. Fla. May 29, 2013); *Ray v. Astrue*, No. 8:08-cv-335-DAB, 2009 WL 799448, at *6-7 (M.D. Fla. Mar. 24, 2009) (reversing, in part, where ALJ failed to discuss VA disability rating other than the plaintiff's testimony); *Hogard v. Sullivan*, 733 F. Supp. 1465, 1469 (M.D. Fla. 1990) (reversing where ALJ rejected VA disability rating based solely on the differing criteria between agencies for determining disability).

Relying upon *Kemp*, Defendant contends that the ALJ sufficiently accounted for the VA rating by implicitly addressing the VA rating through a series of "factors." In *Kemp*, the court determined that an ALJ may implicitly address a VA rating by "rel[ying] on the VA records and referencing the disability ratings, in addition to the relevant evidence, throughout his decision." *Kemp*, 308 Fed. App'x. at 426. Because the ALJ in *Kemp* continuously referred to the VA rating throughout the decision and gave specific reasons that the VA rating did not support a finding of a severe impairment under Social Security standards, the court determined that the ALJ sufficiently accounted for the VA rating. *Id.*

The instant case is distinguishable because the ALJ here did not continuously refer to the VA rating throughout her decision or provide any specific detail regarding her consideration of the VA rating. Because the ALJ merely stated that the VA rating was not binding due to the different standards, the Court cannot determine that the ALJ gave sufficient consideration to the

VA rating. Moreover, the ALJ's statement regarding the VA rating suggests that she did not give the rating considerable weight.

Defendant's reliance on *Pearson v. Astrue*, 271 Fed. App'x 423, 426 (11th Cir. 2008) is also inapposite. In *Pearson*, the court determined that the record established the ALJ considered the VA rating and sufficiently explained that that the plaintiff failed to satisfy the more stringent social security standard. *Pearson*, 271 Fed. App'x. at 981. Although the ALJ here stated that the two standards were different, the ALJ failed to explain how Plaintiff failed to satisfy the more stringent Social Security standard despite the VA rating. Moreover, the ALJ in *Pearson* gave the VA rating great weight but determined that, although the plaintiff was disabled, alcohol abuse was a material contributing factor to his disability. *Id.* Because the ALJ here did not adequately evaluate Plaintiff's VA rating, the Court cannot conclude that the ALJ's decision is supported by substantial evidence.

Finally, although the ALJ mentions the VA's disability ratings, based on this record the Court cannot tell what weight, if any, the ALJ gave to the various VA disability ratings for each impairment. By not providing a more detailed explanation of VA's disability rating, the ALJ failed to comply with SSR 06-3p, and the final decision is not supported by substantial evidence. See *Rodriguez*, 640 F.2d at 686 (5th Cir. 1981) (a VA disability rating of 100% disability should be "more closely scrutinized by the ALJ."). The ALJ's error requires remand pursuant to sentence four of 42 U.S.C. § 405(g). See *Ruiz v. Colvin*, No. 3:13-cv-1102-J-JRK, 2014 WL 4809526, *5-6 (M.D. Fla. Sept. 26, 2014) (remanding pursuant to sentence four of § 405(g)); *Hogard*, 733 F. Supp. at 1468-1469 ("perfunctory rejection of VA disability rating as based on different criteria" warrants remand for application of the proper legal standard).

## CONCLUSION

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **REMANDED** under sentence four of 42 U.S.C. § 405(g)**.** Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, <u>WITHIN FOURTEEN (14) DAYS</u> after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED**, this 27th day of May, 2016.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge